**Katharine Edwards, OSB No. 173393**
attorney@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS, LLC**
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589
Facsimile: (503) 241-2249

Attorney for Plaintiff

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JARL TUFFLI,** | Case No. |
| Plaintiff, | (42 U.S.C. §1983; negligence) |
| v. | |
| **STATE OF OREGON, OREGON DEPARTMENT OF CORRECTIONS, THOMAS BRISTOL, JOSH HIGHBERGER, WARREN ROBERTS, MORIAM BALOGUN, ROSALINDA VIZINA, and JOHN DOES.** | **COMPLAINT** <br> JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Jarl Tuffli alleges as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Jarl Tuffli brings this action under 42 U.S.C. § 1983 against the named defendants for violation of the Eighth and Fourteenth Amendments to the United States Constitution by failing to provide adequate medical care while in custody of the Oregon Department of Corrections.

PAGE 1 – **COMPLAINT**

2.      Defendants repeatedly failed to provide the necessary care for Plaintiff's healing cornea transplant and then delayed necessary care for the resulting eye infection, which became severe and led to the eventual loss of his left eye. Plaintiff did not receive proper medical care for the cornea transplant and was subjected to severe pain and discomfort and continues to be subjected to severe pain, discomfort, and vision loss. Plaintiff was initially transferred to Oregon State Correctional Institution (OSCI) with the understanding that he would undergo the cornea transplant surgery and be given greater access to necessary post-op and long-term care for his left eye. Plaintiff was transferred to OSCI in February of 2020 and the cornea transplant surgery occurred on June 23rd, 2020. The surgery itself went well and the transplant was found to be centered and healthy. In order to maintain the health of his transplant, Plaintiff needed to be on consistent medications and artificial tears, and use eye patches and protective contacts to reduce infection and risk of his body rejecting the transplant. Plaintiff was also instructed to contact his community eye doctors immediately if there was increased redness, swelling, pain, or a decrease of vision in his left eye. On numerous occasions, Plaintiff was forced to use expired eyedrops, wait weeks or even months for refills of his necessary eyedrops, and would run out of protective contacts without timely replacement by defendants. During this time defendants failed to respond to Plaintiff's serious health concerns in a timely fashion leaving Plaintiff constantly worried about his eye and suffering from increased pain. Approximately a year after his surgery, Plaintiff began to experience persistent eye pain and irritation, which he repeatedly reported to defendants. The pain and irritation quickly grew into obvious signs of infection. As the infection worsened, defendants prescribed Plaintiff a medication to which he has a documented allergy in addition to other ineffective medications, and ignored the recommendations of Plaintiff's eye doctor in the community. Eventually, the infection in Plaintiff's eye became so severe, after

PAGE 2  – **COMPLAINT**

defendant ignored or minimized his pleas for help over the preceding months, that his entire left eye had to be removed through evisceration during an emergency surgery and he was hospitalized for eight days to address the ongoing infection. Defendants' failure to provide adequate care for Plaintiff's eye led to the infection and subsequent removal of his eye. Even after the surgery, Defendants still failed to schedule timely post-up visits and provide consistent medication care.

3. Plaintiff seeks declaratory and injunctive relief, an award of compensatory and punitive damages in an amount to be determined at trial, and an award of reasonable attorney fees and costs under 42 U.S.C. § 1988.

4. Plaintiff also alleges supplemental state law claims of negligence.

5. Plaintiff is currently out of custody and not subject to the Prison Litigation Reform Act (PLRA).

6. Defendants are individuals who, during the time of Plaintiff's incarceration, have had authority and responsibility for his treatment, safety, custody, and care.

7. Plaintiff has fully exhausted his available administrative remedies.

8. Plaintiff seeks equitable relief, compensatory and punitive damages, declaratory and injunctive relief, as well as attorney fees and costs as set forth below.

## JURISDICTION & VENUE

9. Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, federal question jurisdiction, and pursuant to 28 U.S. C §1343(a)(3) and (4), civil rights jurisdiction.

10. Venue is in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claim arose in this Judicial District and all Defendants are employed by ODOC in OSCI, which is located in Marion County, Oregon.

## PARTIES

11. Plaintiff Jarl Tuffli is a citizen of the United States. At all times material, Plaintiff was incarcerated in the custody of ODOC at OSCI in Marion County, Oregon.

12. Defendant State of Oregon operates the Oregon Department of Corrections (ODOC) which owns, staffs, and operates OSCI.

13. Defendant Thomas Bristol is and was at all relevant times a medical doctor at OSCI. Defendant Bristol is sued in his individual and official capacities.

14. Defendant Joshua Highberger is and was at all relevant times Superintendent at OSCI. Defendant Highberger is sued in his individual and official capacities.

15. Defendant Warren Roberts is and was at all relevant times Medical Director at ODOC. Defendant Roberts is sued in his individual and official capacities.

16. Defendant Balogun is and was at all relevant times a nurse practitioner at OSCI. Defendant Balogun is sued in her individual and official capacities.

17. Defendant Rosalinda Vizina is and was at all relevant times a nursing staff supervisor at OSCI. Defendant Vizina is sued in her individual and official capacities.

18. Defendant Does are medical staff whose identities are not currently known but will be identified and updated when discovery is completed. All Doe defendants are sued in their individual and official capacities.

19. At all times relevant, Defendant's employees, contractors, and supervisors, as their conduct is alleged herein, were acting within the course and scope of their employment with the defendant.

20. All defendants are sued in their individual and official capacity.

/ / /

## FACTUAL BACKGROUND

21. Plaintiff has a history of eye health issues including the need for a cornea transplant in 2020 which left him susceptible to infection without appropriate precautions and medical attention.

22. Plaintiff entered ODOC custody in 2019.

23. Plaintiff's conditions, allergies and particular vulnerabilities are documented in ODOC's records.

24. On or about November 25th, 2019, Plaintiff's Ciprofloxacin allergy was noted on his medical documents and continued to appear repeatedly on page after page of Plaintiff's ODOC medical records thereafter.

25. On or about January 28th, 2020, Plaintiff was transferred from Deer Ridge Correctional Institution (DRCI) to OSCI to receive a cornea transplant procedure.

26. On or about March 20th, 2020, Dr. Skalet at Eye Health Northwest noted a "corneal injury with poor health" and a "very dense corneal scar" in need of surgical intervention.

27. On or about June 23rd, 2020, while in ODOC custody, Plaintiff received a corneal transplant at Providence Milwaukie Hospital.

28. On or about June 24, 2020, Dr. Skalet noted that the corneal transplant was centered, the wound was healthy, and the surgical sutures were intact. Upon information and belief, Plaintiff's prognosis for full healing and recovery after the transplant was very good.

29. To prevent infection and rejection by his body and to promote healing and comfort, Plaintiff was supposed to clean his eye daily and use cornea bandages, protective

contacts, eye patch, alpha lipoic acid supplement, antibiotic eyedrops, artificial tears eyedrops, and steroid eyedrops.

30. On or about June 26, 2020, Plaintiff requested assistance from Defendant John Doe 1 from ODOC medical with cleaning his eye because he was having difficulty performing the task on his own and it was supposed to be done daily. John Doe 1 responded that Plaintiff his eye would be cleaned during his blood pressure check on Sunday, forcing Plaintiff to wait almost 48 hours for his eye to be cleaned despite requiring daily cleaning.

31. On or about July 7th, 2020, Plaintiff informed medical that an OSCI nurse Defendant John Doe 2 accidentally put "his thumb in my left eye" when measuring Plaintiff's eye patch. Plaintiff expressed concern that his eye was injured but did not receive follow-up medical attention.

32. On or about September 1st, 2020, a progress note written by OSCI medical staff documented that Plaintiff was out of protective contacts and in need of a follow-up eye doctor appointment "ASAP."

33. On or about September 9, 2020, Plaintiff informed medical that his antibiotic eyedrops were expired and that he should not be using them.

34. Plaintiff did not see Dr. Skalet at Eye Health NW until on or about September 21st, 2020. During this appointment he informed Dr. Skalet that his eyedrops were taken away because they were expired and he had not received a replacement prescription. Plaintiff was informed to contact their office immediately if he experienced redness, swelling, pain, or vision loss.

35. During a visit with Behavior Health Services (BHS) on or about November 4th, 2020, Plaintiff reported pain in his left eye which ODOC medical had ignored.

36. On or about December 11, 2020, Multnomah County Circuit Court judge, Honorable Michael Greenlick, admonished defendants on the record during a habeas corpus trial on unrelated medical issues for their failure to properly care for Plaintiff's cornea transplant.

37. On or about December 17th, 2020, Plaintiff informed medical staff that he goes through his eyedrops quickly because sometimes he misses his eye and needs assistance.

38. On or about December 30th, 2020, medical staff noted that Plaintiff was supposed to see Dr. Skalet in a month for follow-up. However, upon information and belief, Plaintiff did not have a follow-up until on or about April 4th, 2021—more than three months later—where Dr. Skalet removed three loose sutures from Plaintiff's eye. Dr. Skalet instructed Plaintiff to continue with the prescription medication eyedrops and to restart bandage contact lenses.

39. On or about April 23, 2021, Defendant Bristol informed Plaintiff that ODOC would no longer provide him with alpha lipoic acid as the Therapeutic Levels of Care (TLC) Committee had denied renewal of the prescription. Upon information and belief, Defendant Bristol is a member of the TLC Committee and Defendant Warren Roberts is the head of the TLC Committee.

40. On or about June 14th, 2021, Plaintiff requested an eye doctor appointment from ODOC medical because of increased pain and worry about more loose stitches. He was also out of corneal bandages. The following day documents show that he was supposed to be issued 14 bandages while waiting for his appointment, which would occur at some unknown date in the future.

41. On or about June 21, 2021, Plaintiff reported increased pain and irritation in his left eye during a medical appointment with Defendant Bristol. Defendant Bristol did not take action to address the pain and irritation.

PAGE 7 – **COMPLAINT**

42.     Though Plaintiff's prescription for artificial tears expired on or about October 3, 2021 and he alerted ODOC staff, but he was not provided with a replacement until December 15, 2021, more than two months later, despite his reliance on the prescription daily for his corneal transplant.

43.     On or about November 10, 2021, Plaintiff requested a corneal bandage from medical. When the corneal bandage was finally placed on his eye a full six days later, medical staff Defendant John Doe 3 observed "light yellow/light greenish drainage" come from his left eye but did nothing to address the symptom of infection.

44.     On or about November 17, 2021, medical staff noted that Plaintiff had acquired "bacterial conjunctivitis" and was being prescribed Gentamicin drops. There is no indication as to how the diagnosis was made nor who made that diagnosis.

45.     On or before November 18, 2021, Plaintiff's Maxitrol Ointment prescription was discontinued despite his reliance on the medication daily for his cornea transplant. He did not receive a replacement, Maxitrol drops, until on or about November 29, 2021, eleven days later.

46.     During a November 19, 2021, appointment with his mental health provider, Plaintiff reported concern about his eye infection.

47.     At the start of 2022, Plaintiff experienced ongoing and increasing severe pain and more signs of infection, which he repeatedly reported to medical.

48.     On or about January 3rd, 2022, Plaintiff's eye was bloodshot with white mucus draining out of it. Defendant John Doe 4 replaced Plaintiff's corneal patch and flushed his eye but did nothing else to address the obviously worsening infection.

PAGE 8 – **COMPLAINT**

49.     That same day, Plaintiff was prescribed and began taking Ciprofloxacin, the medication he is allergic to that has been documented on his medical records since his arrival in 2019 as noted above.

50.     On or about January 4th, 2022, Plaintiff reported that he felt sick, was experiencing increased eye pain, and that green discharge was coming out of his left eye. He reported that during his last visit with Defendant Balogun, she had advised him she would refer him out to see his eye doctor, and he was inquiring as to when that would occur.

51.     On or about January 5th, 2022, Plaintiff saw Dr. Skalet at Eye Health NW. The reason for his visit stated in relevant part: "[i]n the last few days patient noted worsening in current symptoms: thick discharge, redness, pain with eye movement and burning. Patient has been using Maxitrol TID OS and Pred drops a few times daily OS in the last few days. Using AT's twice daily, recently received saline solution from facility which helps. Wearing bandage CL. Vision is the same OS (poor vision). Patient has a lot of difficulty getting his refills of Maxitrol and Pred drops at correction facility." Dr. Skalet also noted a new corneal ulcer in Plaintiff's left eye and recommended Moxifloxacin antibiotic drops hourly. Dr. Skalet recommended a follow-up appointment in 5-7 days. Defendant Balogun signed Dr. Skalet's recommendations.

52.     Plaintiff never received the recommended prescription of Moxiflaxacin and did not go back to see Dr. Skalet for follow-up.

53.     On or about January 6th, 2022, Plaintiff reported increased eye irritation and medical staff noted that his "eye appears worse than the previous day." He was advised by ODOC medical to discontinue Ciprofloxacin and there is no documentation that any medication

was provided to replace it despite the worsening infection and recommendation of Moxiflaxacin by Plaintiff's eye doctor.

54. On or about January 7th, 2022, Plaintiff pleaded for help in a written request where he described weakness, migraine, pain, and an inability to eat for two days. He also reported that his eye was swollen shut. That same day, Defendant Bristol noted in Plaintiff's chart that Plaintiff was experiencing red, purulent discharge and had suffered an allergic reaction to the prescribed Ciproflaxacin. Dr. Bristol prescribed Gentamicin. Plaintiff was still not provided with Moxiflaxacin, the antibiotic that his eye doctor had recommended.

55. Later, on or about January 7, 2022, a nurse from OSCI medical sent Plaintiff to Santiam Hospital for evaluation due to increased eye pain and flinching. Upon his return that same day, the same nurse noted that the hospital had recommended discontinuation of Plaintiff's steroidal eye drops and Gentamicin and instructed him to begin a new prescription of Polymyxin B immediately.

56. Plaintiff returned to OSCI that same day and during the evening medication line on or about January 7, 2022, he received his prescription for Polymyxin B, which he began using as directed immediately.

57. By the following day, on or about January 8, 2022, Plaintiff had begun to experience discomfort that was consistent with allergic reaction, and OSCI medical staff advised him to discontinue the Polymyxin B.

58. On or about January 10, 2022, Plaintiff went to medical with complaints of severe eye pain, redness, swelling, loss of appetite, and weakness. Nurse Krysta Lynch stated in a progress note, "started using the new Rx of drops Friday PM when received from pharm. Stopped using by Saturday afternoon as he noticed an allergic reaction occurring. No complaints

PAGE 10– **COMPLAINT**

in medline on Sunday. Ø Phone call re: concern for eye. This writer hasn't seen his eye since Friday. This is not what it looked like then." Additional documentation described Plaintiff's eye as "extremely red" and "extremely swollen." Plaintiff told the medical staff that he was concerned about an ongoing allergic reaction to the Ciprofloxacin eye drops. Nurse Krysta Lynch made another note less than an hour later stating, "Back to clinic 'I'm very weak.'….didn't eat 3 days, states pain….Eye lid extremely red. Provider to assess now." It is unclear what medical provider assessed him as Ms. Lynch's note indicates was about to occur.

59.     That same day, Plaintiff was transported to the Emergency Department at OHSU. OHSU physicians took cultures from Plaintiff's eye and tested positive for severe streptococcal infection.

60.     On or about January 12th, 2022, Plaintiff's left eye was removed by "evisceration."

61.     Dr. James Anstey from Oregon Health Sciences University recorded in hospital notes dated January 14th, 2022, that Plaintiff was found to have had "orbital cellulitis", "endophthalmitis", and "abscess of orbit".

62.     Due the severity of the infection and necessary eye-removal surgery, Plaintiff was hospitalized for eight days. He returned to OSCI sans his left eye on or about January 18, 2022. Plaintiff's hospital discharge instructions instructed him to continue antibiotics and to return to the outside specialist, Dr. Ashraf, for follow-up and suture removal six days later.

63.     Although Plaintiff had tragically lost his left eye, his pain and suffering did not end as OSCI staff continuously failed to follow the necessary follow-up procedures and medication regiments.

64. On or about February 14th, 2022, Plaintiff communicated to medical that he was twenty days past due for his follow-up visit and that there were still post-surgical stitches in his eye socket.

65. On or about February 19th, 2022, Plaintiff again communicated that he was supposed to have a post-op follow-up six days after his surgery but had still not had one. He stated that this was his third attempt at getting a follow-up and that none of his kytes had been returned. That same day, Nurse Dan Bishop wrote back that Plaintiff had a follow-up scheduled for the end of the month and that he was unsure why the kytes were not getting to Plaintiff.

66. On or about March 19th, 2022, Plaintiff requested an appointment with an eye socket doctor. In response he was told about an upcoming appointment with Dr. Bristol, who is not an eye doctor, to discuss specialist visits.

67. The next day, on or about March 20th, 2022, a progress note stated that Plaintiff's eye lens needed to be put back into place and that yellow drainage was coming out of his left eye socket.

68. On or about March 22nd, 2022, the plastic piece came out of Plaintiff's eye socket, and he requested an emergency appointment.

69. The following day, on or about March 23rd, 2022, Plaintiff stated that the roof of his eye socket had "fallen", that he was in a lot of pain, and that he needed to see Dr. Ashraf.

70. On or about March 25th, 2022, Plaintiff stated that he was told by Dr. Bristol there was nothing that could be done for the infection in his eye socket. Plaintiff once again asked to be seen by an eye socket doctor.

71. On or about March 27th, 2022, Plaintiff had to re-state that he is allergic to Ciprofloxacin and the progress note from that day states that the "wrong eye drops [were]

ordered." The plastic piece in his left eye was found to be "possibly falling out" and his eye socket was described as "collapsing."

72. Despite obvious signs of infection and numerous requests for appropriate medical care and pain relief, Defendants, Bristol, Roberts, and ODOC medical refused to provide Plaintiff with even the bare minimum of care.

73. The developing infection, which defendants failed to treat, and the resulting loss of Plaintiff's eye have caused Plaintiff to suffer ongoing anxiety, distress, humiliation, and embarrassment.

74. To date, Plaintiff suffers with discharge and pain in his left eye socket with permanent damage that limits his ability to use a prosthetic eye.

75. Plaintiff has been forced to adapt to relying on one eye, seriously limiting his vision and preventing him from engaging activities requiring precise vision.

76. Upon information and belief, Defendant Roberts is head of the TLC Committee and is responsible for final decision-making in all TLC decisions on whether to provide medical care to individuals in custody.

77. Upon information and belief, Defendant Bristol is a voting member of the TLC Committee.

78. Upon information and belief, Defendant Balogun is a voting member of the TLC Committee.

79. Upon information and belief, Defendant Vizina supervises OSCI nursing staff.

80. Upon information and belief, Defendant Roberts is responsible for supervising medical providers, developing policies, and maintaining standards of care and treatment protocols across the ODOC medical department.

81. Upon information and belief, neither Defendant Roberts nor ODOC administer any type of formal training to its medical providers related to ODOC medical policies or standards of medical care.

82. Upon information and belief, none of the named defendants have any specialization in ophthalmology, optometry, or eye care in any form.

## COUNT I

### (42 U.S.C. §1983 – Eighth Amendment – Delay and Denial of Essential Medical Care)
### (Against Defendants ODOC, Roberts, Bristol, Balogun, Highberger, and Does)

83. Plaintiff realleges all previous paragraphs as if more fully set forth herein.

84. Plaintiff is entitled to timely and adequate medical care as part of his Constitutionally guaranteed conditions of confinement pursuant to the Eighth Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the Eighth Amendment prohibitions against cruel and unusual punishment.

85. Defendants were aware that Plaintiff had undergone a corneal transplant which had not yet fully healed and required specialized care to prevent infection, rejection of the organ, and other complications.

86. Plaintiff was denied timely, adequate, and proper medical care when defendants failed to address his increasing eye pain.

87. Plaintiff was denied timely, adequate, and proper medical care when defendants did not identify the severity of his eye pain even when infection and swelling was clearly evident.

88. Plaintiff was denied timely, adequate, and proper medical care when defendants repeatedly refused to provide appropriate prescription treatment in a consistent manner, allowing his eye infection to develop and worsen of the course of months.

89. Plaintiff was denied timely, adequate, and proper medical care when defendants continued to ignore the recommendations of outside medical eye specialists.

90. Plaintiff was denied timely, adequate, and proper medical care when defendants failed to address Plaintiff's conditions timely and adequately, causing unnecessary anxiety and distress.

91. Plaintiff was denied timely, adequate, and proper medical care when defendants prescribed a medication, to which he was known to be allergic, as a treatment for infection.

92. Plaintiff was denied timely, adequate, and proper medical care when defendants failed to prescribe appropriate antibiotics or take a culture to determine appropriate antibiotics, allowing his eye infection to worsen over the course of months.

93. Defendants' actions have contributed to worsening of Plaintiff's condition and irreversible harm due to the loss of his left eye.

94. The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

95. Plaintiff is entitled to damages to compensate him for these injuries.

96. Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

97. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

**(42 U.S.C. §1983 – Eighth Amendment – Failure to Adequately Train
& Supervise Subordinate Staff)
(Against Defendants Highberger, Roberts, and Vizina)**

98. Plaintiff re-alleges all prior paragraphs as though fully restated herein.

99. The knowing and willful acts and omissions of Defendants Highberger, Roberts, and Vizina alleged herein constitute deliberate indifference to the substantial risk of serious harm to Plaintiff as a result of inadequate and delayed medical care in violation of the Eighth and Fourteenth Amendments to the United States Constitution, by failing to properly and adequately train and supervise subordinate employees, and tacitly allowing denial and delay of necessary medical care.

100. The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

101. Plaintiff is entitled to damages to compensate him for these injuries.

102. Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

103. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

**(Negligence)
(Against ODOC)**

104. Plaintiff re-alleges all previous relevant paragraphs as if fully stated herein.

105. Defendants knew or should have known that Plaintiff's corneal transplant required specialized care to prevent infection, rejection of the organ, and other complications.

PAGE 16– **COMPLAINT**

106. Defendants knew or should have known that infections of the eye pose heightened risk of serious harm, including brain damage and death.

107. Defendants knew or should have known that repeatedly forcing Plaintiff to go without his preventative eye medications would increase his risk of serious harm, including serious risk of infection and ulcers.

108. Defendants knew or should have known that Plaintiff's persistent eye pain would require medical intervention and that Plaintiff's condition was worsening with time.

109. Defendants knew or should have known that Plaintiff's untreated eye infection would create a significant risk to Plaintiff's health and could potentially cause irreversible harm, including loss of his eye.

110. Defendants knew or should have known that Plaintiff was allergic to Ciprofloxacin.

111. Defendants knew or should have known the serious health risks of leaving an eye infection, after cornea transplant surgery, untreated.

112. Defendants knew or should have known the importance of following the outside surgical specialist's recommendations for consistent prescription medication care and follow-up.

113. Defendants knew or should have known that Plaintiff's eye health history put him at risk of continued pain and health complications without proper and timely follow-up and pain medication. Failure to do so put Plaintiff at risk of additional pain and suffering.

114. Plaintiff has suffered physical harm and severe physical and mental pain and suffering.

115. ODOC failed to use reasonable care in documenting Plaintiff's condition and surgical aftercare needs to ensure adherence by all staff, and to ensure that Plaintiff received proper and timely medical care while in ODOC custody. ODOC's conduct was negligent.

116. Defendant ODOC owes plaintiff a higher standard of care because of the nature of incarceration. As wards of the State, Defendant ODOC manages all aspects of Plaintiff's daily life and decides with whom he will interact, where he will work, live, sleep, bathe, use the toilet, recreate, etc. Had Plaintiff been a free person, he would have been able to follow his surgeon's aftercare instructions and seek out timely medical care, but defendant ODOC prevented Plaintiff from being able to take those measures.

117. Defendant ODOC voluntarily took the custody of Plaintiff under circumstances such as to deprive him of normal opportunities for protection and created a non-delegable duty to ensure that Plaintiff was provided necessary and timely medical care, including adherence to surgical aftercare, paint management, and timely diagnostics, follow-up, and treatment. Defendants have repeatedly failed to meet their obligation to protect Plaintiff from known, obvious, and predictable risk of re-injury, ongoing pain and suffering, and additional damage from lack of treatment.

118. ODOC's conduct was unreasonable in light of the risk of harm to Plaintiff. ODOC controlled all aspects of Plaintiff's life. Plaintiff's harms could have easily been prevented if Defendants provided proper access to Plaintiff's necessary eye medications without gaps, properly followed Plaintiff's surgical aftercare needs, properly addressed his growing infection, and provided him with appropriate medications. This was unreasonable.

119. As a direct and proximate result of ODOC's negligence, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress. Plaintiff should be fully and fairly compensated for his damages in a sum that is determined by a jury.

## PRAYER FOR RELIEF

a. A sum which will fully compensate Plaintiff for his physical pain and suffering;

b. A sum which will compensate plaintiff for his emotional distress;

c. A sum which will fully compensate plaintiff for his economic losses;

d. An award of punitive damages;

e. For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

f. Equitable relief; and

g. For such other and further relief as the Court may deem just and equitable.

Plaintiff demands trial by Jury.

Dated: 11 January 2024

**LAW OFFICE OF KATHARINE EDWARDS**

s/ Katharine Edwards
Katharine Edwards, OSB No. 173393
attorney@kedwards-law.com
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589
Attorney for Plaintiff

PAGE 19– **COMPLAINT**